IN THE UNITED STATES DISTRCT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Ellen Velasco-Thompson, ) | Case No. 23-cv-289 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT AND** |
| ) | **JURY DEMAND** |
| City of Minneapolis, ) | |
| ) | |
| Defendant. ) | |

## NATURE OF THE CASE

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended in 1991 (Title VII), 42 U.S.C. § 2000e, *et seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et. seq.*, and the Minnesota Human Rights Act (MHRA), Minnesota Statutes § 363A.08, *et. seq.*, to correct unlawful employment practices based upon race, national origin, age, and retaliation and to provide appropriate relief to Plaintiff, Ellen Velasco-Thompson ("Velasco-Thompson").

2. As alleged with greater particularity below, Velasco-Thompson alleges that the City of Minneapolis discriminated against her based on her race, national origin, and age in violation of 42 U.S.C. § 2000e, *et seq.* and 29 U.S.C. § 621 *et seq.* and retaliated against her when it terminated her for complaining of discriminatory treatment in violation of 42 U.S.C. § 2000e-3(a). Said discrimination and retaliation also violated the MHRA at Minn. Stats. §§ 363A.08 and 363A.15.

3. Plaintiff further experienced discrimination and retaliation for reporting a suspected violation of law or rule in violation of the Minnesota Whistleblower Act (MWA), Minn. Stat. § 181.935, *et seq.*

4. Defendant also breached a contract with Velasco-Thompson to pay a contracted severance amount at the time of her separation from employment. To date Velasco-Thompson has not received this compensation she is owed.

## JURISDICTION AND VENUE

5. This court has jurisdiction pursuant to 28 U.S.C. § 1331 federal question jurisdiction, as the claims arise from violation of the laws of the United States. Velasco-Thompson timely filed a discrimination charge and a retaliation charge with the City of Minneapolis Department of Civil Rights. Upon closure of that charge, Velasco-Thompson timely filed a request for review by the Equal Employment Opportunity Commission ("EEOC"). Velasco-Thompson received a notice of a right to sue as to her Title VII claims from the Department of Justice and also received a right to sue as to her ADA claims from the EEOC and has complied with all administrative requirements.

6. This court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

7. Venue is appropriate in this District as the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Minnesota.

## PARTIES

8. Velasco-Thompson is a resident of Hennepin County, Minnesota, and at all relevant times was an employee of the City of Minneapolis.

9. The City of Minneapolis ("the City") is an employer engaged in industry affecting commerce located at 350 5th St S, Minneapolis, Minnesota, County of Hennepin.

## FACTUAL BACKGROUND

10. Velasco-Thompson is a 69-year-old woman of South East Asian descent. She has been subjected to discrimination based on her sex, her race and national origin, and her age. She was also demoted and terminated in retaliation for having complained about this discriminatory treatment and for reporting violations of laws applicable to the City and internal rules and standards. The actions of the City violated Title VII, the ADEA, the MHRA, and the MWA.

### Velasco-Thompson Spent Two Decades Doing Stellar Work for the City

11. Velasco-Thompson began working for the City in 1997 when she was hired as the Director of Risk Management & Claims reporting to the Finance Department CFO, John Moir. Over her career with the City, Velasco-Thompson had an exemplary work record.

12. In 1998, Velasco-Thompson worked with the Minneapolis City Attorney's Office to streamline the process for dealing with legal claims brought against the City. She helped establish a committee to negotiate resolution of cases with a dollar value of $25,000 or less. She also was the City representative in appeals before Council Claims, Conciliation Court or District Court, and changed internal practices to decrease future

financial liabilities related to pending lawsuits. Her work saved the City thousands of dollars.

13. In 2000, Velasco-Thompson worked on the City's Construction Team for the Minneapolis Convention Center Expansion Project, obtaining insurance for claims, safety, and contract needs. Project costs were over $117M and the project expanded convention space by 800,000 square feet. She obtained a comprehensive Builders' Risk Policy that covered the City for extensive water damage in the walls/structure due to a faulty sprinkler system that engaged just days before the city took possession of the building.

14. In 2002 Velasco-Thompson worked on the City's Construction Team for the building of the Minneapolis Central Library, providing guidance for insurance, safety, and claims needs for workers' compensation and general liability. The project cost was over $87M for 354,000 square feet of space in a five-story building. For the entire project, the City had zero lost time claims, which set the national record for the longest construction project with no loss time in the U.S.A.

15. From 2001 to 2004, Velasco-Thompson worked on the State of Minnesota Risk Management Team that was responsible for overseeing the Hiawatha Light Rail Line. She again represented the City in procuring insurance, safety and claims needs for workers' compensation and general liability. The project cost total was $715M. The Risk Management Committee met every other week until the completion of the project – she successfully resolved all claims in an efficient manner beneficial to the City.

16.     Beginning August 1, 2007, Velasco-Thompson worked as the Finance/ Administration Section Chief Representative at the Emergency Operations Center during the Collapse of the 35W Bridge, including the rescue and recovery phase, FEMA reimbursement, and the post-event "lessons learned" studied by the National Fire Academy. She presented on the lessons learned issue at the National Public Risk Management Association as a keynote speaker the following year.

17.     Beginning September 1, 2008, Velasco-Thompson worked on a Joint St. Paul/ Minneapolis Risk Management Team that negotiated directly with the Republican National Committee to secure all insurance needs, including law enforcement liability, a centralized claims intake, carrier notification, and claims support from the individual jurisdictions for the National Convention held in the Twin Cities. She remained responsible for this project until all lawsuits were resolved, again in a manner beneficial to the City.

18.     Beginning August 19, 2009, Velasco-Thompson worked as the Finance/ Administration Section Chief at the Emergency Operations Training Center following the Downtown Tornado Event that ripped up the Minneapolis Convention Center (MCC) Roof. She was able to recover over $250,000 for the City in insurance claims.

19.     Beginning May 22, 2012, Ms. Velasco-Thompson worked as the Finance/ Administration Section Chief at the Emergency Operations Training Center during the North Minneapolis Tornado Event recovery, along with FEMA reimbursement and supporting loss documentation resulting in insuring the Minneapolis Water Works, Fridley, and Columbia Heights facilities. She coordinated City assistance for vendor

clean-up, tree removal, and procuring neighborhood tents for water, power stations, and support. For the Minneapolis Water Works, Ms. Velasco-Thompson and her team were able to document over $2M in reimbursements.

20. On October 23, 2013, the Sexton Lofts were flooded by a broken City water main that resulted in significant water damage. Ms. Velasco-Thompson and her team located missing owners, relocated and reimbursed living expenses for those whose claims were rejected by their property insurance carriers. The City was sued for not reimbursing property insurers for their losses. Velasco-Thompson was deposed and was the City representative for the case that went to the Minnesota Supreme Court. The Court affirmed the City's position in that case.

21. During the period 2015 to 2016, Velasco-Thompson worked with staff to revise City practices and obtained City Council authority for the following:

(1) Revision of the Tort Claims Appeal Process allowing claims to proceed directly to Conciliation or District Court for appeals, thereby relieving the need for review by the City Council Claims Committee;

(2) Granting the Risk Management and Claims Division the authority to pursue Subrogation claims up to $25,000 against entities that have damaged City property or injured city workers and allowing flexibility to pursue claims in Conciliation or District Court, or to otherwise resolve claims in an expedited manner; and

(3) Implementing a City driving policy to eliminate distracted driving for all City drivers. The procedural changes included a 311 Reporting system,

taped complaints forwarded to the driver's supervisor, evaluation of the event, the need to assign specific online training, measurements, and data metrics on completion. All these actions led to a decrease in complaints and vehicular accidents.

22. Between February 1, 2017 and February 5, 2018, Velasco-Thompson was asked by the City's CFO at the time, Patrick Born, to work with the Super Bowl (SB) Host Committee to negotiate risk transfer liability for all law enforcement jurisdictions working the ten days of the event. She negotiated to have all premiums paid directly by the SB Host Committee and made the insurance and the deductibles the responsibility of the SB Host Committee for their event liability issues. The City would be responsible for their own liability. To date, the only known claims the City has experienced from the SB event are for property damage claims to public works by vendors working the event.

23. Because of her experience and training, Velasco-Thompson was given considerable responsibility for high-level projects over the course of her career with the City. She worked on many sensitive projects, figured out resolutions to many conflicts, and communicated her efforts up and down the chain of command. Her work was uniformly and highly valued by her previous supervisors, peers, and direct reports throughout her tenure with the City. She received impeccable performance reviews – until the City hired Mark Ruff as Assistant City Coordinator and CFO on March 28, 2016.

### Ruff's Time as Velasco-Thompson's Supervisor

24. After Ruff's appointment he, on behalf of the City and with knowledge of appointed City leaders, harassed Velasco-Thompson and targeted her for employment termination because of her gender, race/national origin, and age.

25. Multiple times in 2017, Ruff's assigned HR representative asked Velasco-Thompson uncomfortable questions that never had been posed prior to Ruff's appointment, such as, "When are you retiring?" Velasco-Thompson turned 64 in 2017.

26. When Velasco-Thompson responded she wanted to work as long as she was physically fit and able, Ruff began to make Velasco-Thompson's work environment extremely difficult and hostile.

27. Ruff's tactics include routine & systemic harassment, bullying, intimidation with no witnesses, intentional misdirection, denial of earned vacation, prevention of disciplinary action of certain staff, removal of decision-making authority by his micro-management, and inaction on requests. Ms. Velasco-Thompson was a victim of these tactics.

28. For example, Velasco-Thompson was scolded at one-on-one meetings with Ruff and reprimanded for not anticipating what projects he wanted her to work on or how he wanted projects completed. She also was accused of not doing her job – even though Ruff gave Velasco-Thompson multiple, different, varying answers to questions she asked about projects. Ruff was inconsistent in prioritizing her projects.

29. Ruff displayed extreme anger when Velasco-Thompson followed procedure for completing projects. He verbally bullied Velasco-Thompson. His face would show

great displeasure when she would bring the Risk Manager with her to meetings in order to have a witness present. Ruff took credit for Velasco-Thompson's recommendations to resolve issues and blamed her for negative outcomes.

30. Ruff at one point boasted to persons in his department that, "I know how to get rid of people."

31. Velasco-Thompson experienced gastric distress because of the pressure from Ruff. She woke up nightly at 2 or 3 am before interactions with Ruff and sought assistance from the City Employee Assistance Program and other counselors about how to handle the situation.

32. Ruff's public persona was to give Velasco-Thompson accolades for her good work outcomes and then to yell at her in private meetings.

33. Ruff worked to turn his department into a male-centered department, pushing out female senior staff for his own people. By 2018, Velasco-Thompson was one of the few female Director-level staff member still reporting to Ruff.

34. The female, Caucasian controller on staff before Ruff's arrival was downgraded to temporary job status and unappointed when she turned 64. She departed when she turned 65.

35. The Council-trusted, Black female in her 50's who was interim Budget Director was not given a chance to apply for the Budget Director position, so she left to work for another city. A young white male with no previous budget experience was selected as her replacement, and he moved on within a few years.

36. Almost all of Ruff's Divisional Directors were Caucasian. His female HR representative assigned by the City's HR Department was urged to move on and was replaced with a white male.

37. As a Director and direct report to the CFO for the majority of her years, Velasco-Thompson was always the bottom of the pay grade out of the five or six Directors. She thought it was because she had the least seniority compared to her male counterparts, but as the years passed, it became clear this was not true.

38. Velasco-Thompson requested raises commensurate with her experience and job duties. However, her supervisors would cite budget constraints in denying her requests for pay raises.

39. Budget constraints does not explain why even after 20 years of experience Velasco-Thompson remained at the bottom of the Director-level pay grade. The only explanation is related to her gender and/or race/ethnicity.

40. Instead of providing pay increases to rectify the pay disparity, Ruff took the opposite tact. On November 17, 2017, Velasco-Thompson's twentieth work anniversary, Ruff notified her she would not be receiving her Step increase of $3,000. This generally-rubber-stamped increase was denied with no reasoning provided to Velasco-Thompson.

41. There was no basis or reason not to allow for their step increase, other than to make Velasco-Thompson more uncomfortable in her working environment, and to increase the hostility of the environment so that she might resign. This decision adversely affected not only her yearly salary, but also her pension.

42. During this same time-period, Ruff chose not to listen to or act on Velasco-Thompson's recommendations to insure and bond both the City's CFO and Treasurer as required in state statute. He also did not act on the recommendation to designate clear separation of duties between these two roles. Both recommendations are not only industry accounting standards but reinforce the integrity of each role and provide additional checks and balances on large financial transfers. To not do these things left both the individuals and the City at risk. Ruff showed great displeasure that Velasco-Thompson stood her ground on this issue.

43. On February 13, 2018, the day after Ms. Velasco-Thompson's 65th birthday, Ruff provided her with a copy of a negative performance evaluation. There was no basis or justification for the negative performance review.

44. Ruff gave Velasco-Thompson glowing compliments in public because she is well-liked and continued to perform her job duties very well but in private criticized her to make her work environment hostile. The negative review was manufactured to provide "cover" for Ruff's intent to get rid of Velasco-Thompson, a 64-year-old, minority woman.

45. Because of the negative review, Velasco-Thompson was denied another annual step increase, which should have taken her to an annual salary (Step 8) of $125,530.99. The loss of these Step increases further eroded her pension contributions and adversely impacted the benefits Velasco-Thompson would receive in retirement.

46. In sum, Velasco-Thompson qualified for two Step Increases in 2017 and 2018. Ruff denied them both based on false performance evaluations that did not comport

with City performance review procedures, and that were completely out-of-line with the historical evaluations Ms. Velasco-Thompson received from other supervisors.

### **Ruff Retaliated Against Velasco-Thompson for Reporting Unlawful Activities**

47. In February 2018, Velasco-Thompson received a call from Accounting that a large amount of money was to be transferred out of an internal City fund called the Self Insurance Fund and requested her approval. Velasco-Thompson said she did not authorize that transfer.

48. Within minutes she received a call from Ruff stating he had authorized it, but it was of no concern since he would see that four percent was returned each year until the transfer was fully paid back.

49. Velasco-Thompson later talked to Ruff in more depth and explained that reductions in the Self Insurance Fund was very visible when the CAFR (Comprehensive Accounting Financial Report) would be published. Rating agencies, the State Auditor, and Internal Auditors would see the drop in funds and ask questions that have in the past led to downgrades by Rating Agencies on the City's credit rating.

50. Velasco-Thompson advised Ruff against re-directing funds from the Self Insurance Fund Reserve to other projects, because to do so ignored standard actuarial practices for reserving adequate funds for claims, both present and future.

51. Velasco-Thompson told Ruff that taking money from this fund would leave the City at greater financial risk with current (not reserved) dollars and result in a bonding downgrade for the City.

52. This bonding downgrade did occur at the end of 2018.

53. Shortly after Velasco-Thompson refused to approve the transfer from the Self Insurance Fund and challenged Ruff's decision, Ruff emailed Velasco-Thompson informing her she had been removed from her position and that she could either separate from employment from the City of Minneapolis completely or accept a job called Manager of Special Projects for an unknown temporary time-period for an unknown salary doing tasks that Ruff could not define.

54. Velasco-Thompson decided not to take the Special Projects position at a lower wage because it was clear to her that Ruff was setting her up for termination.

55. On March 15, 2018, Ms. Velasco-Thompson was wrongfully and illegally terminated from her position as the Director of Risk Management & Claims.

56. Despite the harassment by Ruff and creation of a hostile work environment because of Velasco-Thompson's age, sex, and race/national origin, Ruff could not push her out. Ruff ultimately retaliated against Velasco-Thompson and ultimately terminated her because she reported his violation of rules and laws applicable to the City when Ruff made unauthorized transfers of money from the City's self-insurance fund.

57. Ruff resigned on August 1, 2021.

## Contract for Payment at Separation

58. Because she was hired into an appointed position and not afforded civil service status, Velasco-Thompson's contract contained a provision promising a six-month severance benefit at the time of her separation from employment. Interestingly, that contract has "disappeared" from her personnel file. However, the City Ordinance in effect at the time clearly corroborates the fact that Velasco-Thompson is entitled to

severance upon employment termination. She was not paid this compensation that was due her.

59. As a result of the discrimination and retaliation Velasco-Thompson was subjected to by the City she has been unfairly and illegally subjected to sex, race/national origin, and age discrimination, and ultimately offered a demotion and, when that was refused, she was terminated. Her professional standing and reputation have been damaged. Her professional opportunities for advancement internally and externally have also been severely damaged. She has suffered emotional damages.

## JURY DEMAND

60. Plaintiff hereby demands a jury trial on any issue triable as a matter of right.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

61. Plaintiff realleges the paragraphs above and incorporates them herein.

62. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a).

## COUNT II
## NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII

63. Plaintiff realleges the paragraphs above and incorporates them herein.

64. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§2000e-2(a).

## COUNT III
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

65. Plaintiff realleges the paragraphs above and incorporates them herein.

66. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a).

## COUNT IV
## RETALIATION IN VIOLATION OF TITLE VII

67. Plaintiff realleges the paragraphs above and incorporates them herein.

68. Defendant's actions as set forth above, including demoting her and terminating her after she complained of unequal pay, constitute retaliation against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, in violation of 42 U.S.C. §2000e-3(a).

## COUNT V
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA

69. Plaintiff realleges the paragraphs above and incorporates them herein.

70. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a).

## COUNT VI
## RETALIATION IN VIOLATION OF THE ADEA

71. Plaintiff realleges the paragraphs above and incorporates them herein.

72. Defendant's actions as set forth above, including demoting her and terminating her after she complained of unequal pay, constitute retaliation against Plaintiff in violation of Title VII of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d).

## COUNT VII
## RACE DISCRIMINATION IN VIOLATION OF THE MHRA

73. Plaintiff realleges the paragraphs above and incorporates them herein.

74. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her race in violation of Minn. Stat. §363A.08, subd. 2.

## COUNT VIII
## NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF THE MHRA

75. Plaintiff realleges the paragraphs above and incorporates them herein.

76. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her national origin in violation of Minn. Stat. §363A.08, subd. 2.

## COUNT IX
## SEX DISCRIMINATION IN VIOLATION OF THE MHRA

77. Plaintiff realleges the paragraphs above and incorporates them herein.

78. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her sex in violation of Minn. Stat. §363A.08, subd. 2.

## COUNT X
## AGE DISCRIMINATION IN VIOLATION OF THE MHRA

79. Plaintiff realleges the paragraphs above and incorporates them herein.

80. Defendant's actions as set forth above constitute discrimination against Plaintiff based on her age in violation of Minn. Stat. §363A.08, subd. 2.

## COUNT XI
## RETALIATION IN VIOLATION OF THE MHRA

81. Plaintiff realleges the paragraphs above and incorporates them herein.

82. Defendant's actions as set forth above including demoting her and terminating her after she complained of unequal pay, constitute reprisal and retaliation against Plaintiff for having complained of being discriminated against on the basis of her age, race, sex, and national origin by Defendant in violation of Minn. Stat. §363A.15.

## COUNT XII
## VIOLATION OF MINN STAT § 181.932 –
## MINNESOTA'S WHISTLEBLOWER STATUTE

83. Plaintiff realleges the paragraphs above and incorporates them herein.

84. Plaintiff reported violations of laws and rules applicable to the City to her supervisor, the City CFO, Mark Ruff. In response, Ruff demoted and then terminated Plaintiff.

85. Plaintiff was penalized, threatened, and disciplined regarding the terms and conditions of her employment, and ultimately terminated, because she had, in good faith, reported to her employer violations or suspected violations, of federal, state, common law or rule adopted pursuant to law.

## COUNT XIII
## BREACH OF CONTRACT

86. Plaintiff realleges the paragraphs above and incorporates them herein.

87. Plaintiff had a signed contract to be paid compensation at her separation with the City. Plaintiff signed this contract during her employment. No contract was signed to supersede this contract.

88. Plaintiff's employment with the City ended on March 15, 2018. To date she has not been paid her severance that is due and owing.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

A. Order Defendant to make Velasco-Thompson whole by paying her damages in excess of $50,000 on each of Counts I through XII;

B. Award Plaintiff her past and future lost income, benefits, wages, pension payments, and all economic amounts recoverable under Title VII, the ADEA, the MWA, and the MHRA;

C. Award Plaintiff the severance due under the separation contract in Count XIII;

D. Order Injunctive Relief as is just and equitable;

E. Award Plaintiff damages and relief available under Title VII, the ADEA, the MWA, and Minn. Stat. §§363A29, Subd. 4(a) and Subd. 5(1), including but not limited to, damages for mental anguish or suffering and other damages;

F. Treble damages as are allowable under the MHRA, Minn. Stat. §363A.29. Subd. 4(a);

G. Award damages as permitted by applicable statute and law;

H. Award Plaintiff her costs, disbursements, and attorney's fees as permitted by law;

I. Grant such other relief as the court deems just and equitable.

**FIEBIGER LAW, LLC**

Dated: February 4, 2023

By: s/Rolf T. Fiebiger
Rolf T. Fiebiger (#391138)
6800 France Ave S., Suite 190
Edina, MN 55435
Telephone: 612.888.6084
rolf@fiebigerlaw.com

Attorney for Plaintiff
Ellen Velasco-Thompson